# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# WESTERN DIVISION

IN RE:

BK 10-71051

JOE WILLIE FIELDS, JR.,

    Debtor.

AP 10-70021

JOE WILLIE FIELDS, JR.,

    Plaintiff

VS

EDUCATIONAL CREDIT
MANAGEMENT CORPORATION,

    Defendant.

## MEMORANDUM OPINION

This adversary proceeding came before this court on Wednesday, December 7, 2011 for trial on Joe Willie Fields, Jr.'s ("Debtor") Complaint to Determine Dischargeability of Debt. Annette B. Crain appeared on behalf of Debtor; W. McCollum Halcomb appeared on behalf of Educational Credit Management Corporation ("ECMC"). After reviewing the evidence admitted at trial and the arguments of the parties, this court **GRANTS** Debtor's request and finds that it would be an undue hardship on Debtor to except the student loan obligations owed to ECMC from discharge and further finds that the student loan obligations owed to ECMC are dischargeable pursuant to 11 U.S.C. § 523(a)(8).

1

## JURISDICTION

The district court has jurisdiction of this adversary proceeding pursuant to 28 U.S.C. § 1334(a) & (b). Jurisdiction is referred to the bankruptcy courts by the General Order of Reference of the United States District Court for the Northern District of Alabama, signed July 16, 1984, as Amended July 17, 1984 pursuant to 28 U.S.C. § 157(a). The bankruptcy court may enter an appropriate order and judgment pursuant to 28 U.S.C. § 157(b)(2)(I).

## FINDINGS OF FACT

The facts are not in dispute.[1] Debtor was adjudicated disabled by the Social Security Administration on March 18, 2010. Debtor was determined to be disabled as of 2008. (Plaintiff's Exhibit I). The Social Security Administration found that:

> The medical evidence of record showed that the claimant has a confirmed schizophrenic delusional, paranoid and psychotic disorder that has led to a depleted function despite psychotropics, and psychosocial support. His attempt to jump from the second floor of a motel and [sic] was thwarted by the police who finally brought him to the hospital for treatment. His seven days drive across the 4 states in his effort to escape from imaginary individuals that were threats to his life, is also a severe sign of chronic mental impairment that has a character of permanency.

(Plaintiff's Exhibit I). Debtor testified that he was first diagnosed with paranoid schizophrenia, anxiety disorder and depression in 1999.[2] He is being treated at the Montgomery Area Mental Health and Indian Rivers Mental Health in Tuscaloosa. (Defendant's Exhibit 1). He takes Zyprexa, Paxil, Remeron, and Vistaril. (Defendant's Exhibit 1).

---

[1] Unless otherwise indicated, all facts are taken from the Stipulation of the Parties. (AP Doc. 50).

[2] In his Response to ECMC's Interrogatories, Debtor stated that he was first diagnosed in 1993. (Defendant's Exhibit 1). Debtor testified that this was incorrect; he remembers that he started having problems the year after he graduated law school, which would be 1999.

2

Debtor filed a voluntary bankruptcy petition pursuant to Chapter 7 of the United States Bankruptcy Code on May 7, 2010. (Bk. Doc. 1). Debtor scheduled assets including a 2000 Ford Focus with a value of $2,500.00 and other normal household goods, clothing and accessories. Debtor scheduled a bank account with a balance of approximately $23,000.00.[3] This balance represents proceeds of the Social Security disability payments paid retroactively from the date his disability was determined; no other funds were placed in that account. Debtor testified that he used this money to pay living expenses. Specifically, Debtor testified that he prepaid $10,800.00 in rent when he moved to Pratville, Alabama postpetition and that he also bought a refrigerator, washer and dryer, and a bed.[4] In addition, Debtor is also using the proceeds to pay for ongoing monthly expenses that his Social Security Disability income does not cover.

Debtor scheduled $1,113.00 per month in disability income, which equates to $13,356.00 per year.[5] (Bk. Doc. 1). The 2011 Department of Health and Human Services (HHS) Poverty Guideline for a household of one was $10,980.00. (Plaintiff's Exhibit C). Debtor scheduled $1,113.00 in monthly expenses. Specifically, Debtor scheduled: $300.00 for rent, $60.00 for telephone services, $500.00 for food, $20.00 for clothing, $75.00 for transportation, $100.00 for recreation, and $58.00 for auto insurance. (Bk. Doc. 1). Debtor testified at trial that these expenses are no longer accurate.

---

[3]Debtor claimed these proceeds as exempt. No objection to Debtor's exemptions was filed.

[4] Debtor does not have any living room furniture and he is driving a 2000 Ford Focus with a value of $2,500.00: Debtor did not buy living room furniture or a new car with the Social Security proceeds.

[5]Plaintiff's gross earnings for tax year 2007 were $40,333.00. Plaintiff has not been required to file a tax return since tax year 2007.

3

At the time Debtor filed this bankruptcy petition, he was living with his sister in Tuscaloosa, Alabama. He subsequently moved to an apartment in Prattville, Alabama because he no longer felt welcome in his sister's house. Debtor testified that his current monthly expenses are as follows: $775.00 for rent, $160.00 for electricity, $51.00 for water, $108.00 for cable/internet/phone, $26.00 for medication, and $110.00 for Medicare. Debtor further testified that he was in the negative every month about $100.00 and that he used the proceeds from the Social Security disability payments paid retroactively to make up for this shortfall. At the current rate, Debtor believes the Social Security proceeds will run out within a year.

On July 14, 2010, Debtor commenced this adversary proceeding by filing the Complaint to Determine Dischargeability of Debt. Debtor asserts that he should be afforded a discharge of the student loans owed to ECMC pursuant to 11 U.S.C. § 523(a)(8) as being forced to repay them would cause an undue hardship.

Debtor incurred student loans[6] during the course of his successful pursuit of an undergraduate degree in political science from Auburn University in Montgomery in 1995 and a juris doctorate degree from Hamline University School of Law in 1998.[7] Debtor failed to obtain a license to practice law although he sat for the bar exam seven times. On September 6, 2004, Debtor executed a FFELP Federal Consolidation Loan Application and Promissory Note which was to consolidate 9 educational loans. Pursuant to the consolidation loan, $90,150.41 was disbursed November 19,

---

[6]Such student loans are educational benefits or loans made, insured, or guaranteed by a governmental unit or were under a program funded in whole or in part by a governmental unit or nonprofit institution, or is an obligation to repay funds received as an educational benefit as contemplated by 11 U.S.C. § 523(a)(8).

[7]Debtor's student loan debt comprised approximately 85% of his unsecured debt.

4

2004. The original lender on the consolidation loan was SLM Education Loan Corp. The original guarantor on the consolidation loan was United Student Aid Funds, Inc. ("USAF"). On August 16, 2010, USAF assigned to ECMC[8] the educational debt due pursuant to the September 6, 2004 FFELP Consolidation Loan Application and Promissory Note. Debtor has not made any payments on the educational debt held by ECMC.[9] The amount due on the consolidation loan, as of August 20, 2010, was $114,965.07. The per diem interest is $13.37.

Debtor has various repayment options available under the FFELP and through the William D. Ford Federal Direct Loan Payment ("Ford").[10] Under Ford, Debtor would have the option to repay his loans under four basic plans: Standard Repayment Plan, Extended Repayment Plan, Graduated Repayment Plan, and Income Contingent Repayment Plan.[11] If Debtor demonstrates a

---

[8]ECMC is a specialized student loan guarantor guarantying educational debt made under the Federal Family Education Loan Program ("FFELP"), at the request of the United States Department of Education and other student loan guarantors.

[9]Debtor testified that he did not pay ECMC because he applied for and received deferments until 2010. Debtor further testified that he did pay Sallie Mae, a student loan lender who is no longer a party to this adversary proceeding, for 4 or 5 years because he could not obtain any more deferments from Sallie Mae.

[10]Debtor is eligible to consolidate through Ford.

[11]Under the Income Contingent Repayment Plan, Debtor's monthly payments would be calculated on the basis of his annual adjusted gross income, total loan amount and family size. His payment would be the lesser of the following two calculations: (1) the amount he would pay if he repaid the loan twelve (12) years multiplied by an annual percentage factor that varies with the borrower's annual income; or (2) Twenty percent (20%) of Plaintiff's discretionary income, which is his adjusted gross income minus the poverty level for his family size as set by the U.S. Department of Health and Human Services Poverty Guidelines. If the income is below the poverty guideline, the monthly payment would be $0.00. The monthly payment is adjusted annually. The maximum repayment period is 25 years.

partial financial hardship he is eligible to repay his loans through the Income Based Repayment.[12]

Debtor has filled out two applications for a total and permanent disability discharge for his student loans, but neither application has been submitted. The first application has a Physician's Certification dated March 18, 2011. (Plaintiff's Exhibit E). The certification indicates that Debtor is "permanently mentally disabled due to schizophrenia and concomittant medications," that Debtor is "able to do menial tasks so long as no stress is involved," and that Debtor "does not do well in groups." (Plaintiff's Exhibit E). The certification also indicates that Debtor is "unable to engage in any substantial gainful activity in *any* field of work by reason of a medically determinable physical or mental impairment that . . . has lasted for a continuous period of not less than 60 months [and] can be expected to last for a continuous period of not less than 60 months." (Plaintiff's Exhibit E). Debtor testified that the first Discharge Application was not submitted because the physician did not fill out the certification correctly. The second Physician Certification, dated May 11, 2011, contained the same information. (Plaintiff's Exhibit F). Debtor testified that the second Discharge Application was not submitted because it was signed by a nurse practitioner and not a physician.

Debtors resume contains the following information: Debtor graduated Auburn University-Montgomery in 1995 with a Bachelor of Science in Political Science with a minor in Justice & Public Safety. Debtor graduated Hamline University School of Law in 1998 with a Juris Doctor. Debtor has 10 years experience in residential and commercial real estate. He has worked with

---

[12]Under the Income Based Repayment, his aggregate monthly loan payment is calculated on the basis of his adjusted gross income and family size. Under the Income Based Repayment, he would pay fifteen percent (15%) of the amount by which his adjusted gross income exceeds 150% of the poverty line income applicable to his family size. If a borrower's adjusted gross income is less than 150% of the poverty guideline for his or her family size, then the borrower will have monthly payments of $0.00. The monthly payment is adjusted annually. The maximum repayment period is 25 years.

6

lenders, title companies, and corporate real estate departments and is familiar with loan, leasing and real estate documents. Debtor also has experience with loan file review/audit, and commercial lease abstracting. Debtor is familiar with Regulation Z, RESPA, Regulations B, HMDA, HOPA, ECOA, and fair lending laws. Debtor has not been steadily employed since January of 2008. (Plaintiff's Exhibit G). Between January 2008 and April 2010, Debtor submitted 10 applications with real-estate-related businesses in Tuscaloosa, Birmingham, and Montgomery, Alabama without any response. (Defendant's Exhibit 1). Debtor testified that he also applied for jobs in 2011, but not in the past three months.

      Debtor provided the court with the following work history: From January 1998 to April 2000, Debtor worked as a Post Closing Specialist for Title One, Inc. where he investigated to ensure that closing requirements were achieved, conducted examination of HUD settlement statements, deed, mortgages, assignments, subordination agreements, real estate taxes, special assessments, easements, issued long and short form title insurance policies for lenders and owners and responded to lender inquiries about title insurance status. From April 2000 to June 2000, Debtor worked as a Pre-Fund Analyst for Wells Fargo Mortgage where he performed credit checks and social security traces, verified employment, deposits, payoffs, and examined title commitment for lien problems. From June 2000 to December 2001, Debtor worked as a paralegal for The Affiliates where he drafted lease amendments, memorandum of agreements, vendor contracts and commenced leases, verified legal descriptions, checked vendor registration with Secretary of State, obtained certificates of good standing, corresponded with site acquisition team, obtained necessary documentation from landlords and vendors and other legal research. Debtor quit because he thought co-workers were discriminating against him. (Defendant's Exhibit 1). Debtor now knows that this belief was the

7

result of his paranoia. (Defendant's Exhibit 1). From March 2002 to September 2002, Debtor worked as Post Closing Specialist for Coldwell Banker Burnet where he prepared real estate documents for filing with the county recorders office, reviewed closing documents during closing to check for legal errors, and drafted and issued title insurance. From October 2002 to August 2003, Debtor worked as a Paralegal/Operation/Compliance Specialist/Sales Compliance Specialist for Wells Fargo Home Mortgage where he audited real estate files of closers and mortgage specialists for compliance with company guidelines in addition to federal law. Debtor quit because he was paranoid that co-workers were out to get him. (Defendant's Exhibit 1). From March 2003 to December 2003, Debtor worked as a Site Responder for Wilder Foundation where he was on call after office hours to respond to resident emergencies, maintained community building, built positive relationships with residents, and recommended policy changes to the housing manager. Debtor quit Wilder Foundation because he was too scared to work there. (Defendant's Exhibit 1). From April 2004 to May 2005, Debtor worked as a Real Estate Paralegal for Premier Mortgage Funding, Inc., where he obtained loan officer licenses from several states and completed loan officer license applications and made sure all license requirements were met. Debtor left Premier Mortgage Funding, Inc. for a higher paying job. (Defendant's Exhibit 1). From May 2005 through May 2006, Debtor worked a Lease Administrator for SBA Communications Inc., where he prepared legal and leasing documents, interfaced with the client, landowner and the project/field staff to define contract and other real property issues and facilitated the negotiation process between field staff, landowners and corporate staff. Debtor also organized and maintained comprehensive documentation of all activities and confirmed all necessary compliance documentation. Debtor was laid-off from SBA Communications, Inc. (Defendant's Exhibit 1). From August 2006 to January 2008, Debtor worked

8

as a Lease Administrator for Cushman & Wakefield where he was responsible for administering and tracking the leases of rental properties in the company's portfolio, tracked lease financial transactions, and processed the leases to make sure all information was accurate and logged onto a database and filed appropriately. (Plaintiff's Exhibit G). Debtor was fired from Cushman & Wakefield because he was too scared to go to work: He missed too many days and they could not depend on him. (Defendant's Exhibit 1).

Debtor testified that he is currently looking for work and has applied for work in the year 2011, but that he has not had any luck in finding a position. He applied numerous places online and had an interview with a temporary employment agency in 2010, but did not get the job. Debtor testified that he applied for retail jobs, but is afraid that he would not be able to keep such a job if one was offered to him. Debtor has difficulties dealing with strangers and gets really nervous.

## CONCLUSIONS OF LAW

On July 14, 2010, Debtor commenced this adversary proceeding by filing the Complaint to Determine Dischargeability of Debt. Debtor asserts that he should be afforded a discharge of his student loans as being forced to repay them would cause an undue hardship as contemplated by 11 U.S.C. § 523(a)(8). Section 523(a)(8) provides:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt-
> > (8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for-
> > > (A)    (i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or
> > > (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend, or
> > > (B) any other educational loan that is a qualified educational loan, as defined

9

in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual.

11 U.S.C. § 523(a)(8).

"The creditor bears the initial burden of establishing that the debt is of the type excepted from discharge under § 523(a)(8)." Bronsdon v. Educ. Credit Mgmt. Corp. (In re Bronsdon), 435 B.R. 791, 796 (1st. Cir. BAP 2010). The parties stipulated that the student loans at issue are educational loans as contemplated by 11 U.S.C. § 523(a)(8). "Once the showing is made, the burden shifts to the debtor to prove that excepting the student loan debt from discharge will cause the debtor and her dependents 'undue hardship.'" Id.

The term "undue hardship" is not defined in the Bankruptcy Code, so the court must look to case law to determine the meaning of the phrase. The Eleventh Circuit Court of Appeals has adopted the standard set forth by the Second Circuit Court of Appeals in Brunner v. New York State Higher Educ. Servs. Corp., 831 F. 2d 395 (2d Cir. 1987) (per curiam). Hemar Ins. Corp. of America v. Cox (In re Cox), 338 F. 3d 1238, 1240 (11th Cir. 2003). "To establish undue hardship, the Brunner standard requires the debtor to prove by a preponderance of the evidence:

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for [himself] and [his] dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

Brunner, 831 F. 2d at 396." Educ. Credit Mgmt. Corp. v. Mosley (In re Mosley), 494 F. 3d 1320, 1324-25 (11th Cir. 2007). If the debtor fails to prove any of the three prongs of the Brunner test, the inquiry ends and the court must find that the student loan is not dischargeable.

The first prong of the Brunner standard requires that a debtor prove that he "cannot maintain,

10

Case 10-70021-CMS    Doc 53    Filed 03/23/12    Entered 03/23/12 11:39:20    Desc Main
Document      Page 10 of 17

based on current income and expenses, a 'minimal' standard of living for [himself] and [his] dependents if forced to repay the loans." In re Mosley, 494 F. 3d at 1324-25. "A 'minimal standard of living' is not such that debtors must live a life of abject poverty, but it does require 'more than a showing of tight finances.'" McLaney v. Kentucky Higher Educ. Assistance Auth. (In re McLaney), 375 B.R. 666, 674 (M.D. Ala. 2007) (quoting In re Faish, 72 F. 3d 298, 306 (3d Cir. 1995)). "'[A] minimal standard of living lies somewhere between poverty and mere difficulty.'" Id. (quoting In re McLaney, 314 B.R. 228, 234 (Bankr. M.D. Ala. 2004)). "Courts conduct this analysis by comparing debtor's disposable income, determined as the difference between his monthly income and his reasonable and necessary monthly expenses, with the monthly payment necessary to repay the student loans." Id. "A court making this determination:

> must apply its common sense knowledge gained from ordinary observations in daily life and general experience to determine whether [a debtor's] expenses are reasonable and necessary. If [the debtor] expends funds for items not necessary for the maintenance of a minimal standard of living or if [the debtor] expends too much for an item that is needed to maintain that minimal standard, then it is unlikely that, given [the debtor's] present circumstance, the first prong of the *Brunner* test is satisfied where such overpayment would permit [the debtor] to cover the expense of her student loan debt without sacrificing a minimal standard of living . . .

Id. (quoting In re Douglas, 366 B.R. 241, 253-54 (Bankr. M.D. Ga. 2007)).

Debtor receives $1,113.00 per month in Social Security Disability. This is Debtor's only source of income as he has been unable to find steady employment since his lost his position with Cushman & Wakefield in January of 2008. Therefore, Debtor has an annual income of $13,356.00, just $2,376.00 above the 2011 Department of Health and Human Services Poverty Guideline for a household of one.[13] Debtor has already come a long way in showing that he could not maintain a

---

[13] The 2011 Department of Health and Human Services Poverty Guideline for a household of one was $10,980.00.

11

Case 10-70021-CMS    Doc 53    Filed 03/23/12    Entered 03/23/12 11:39:20    Desc Main
Document      Page 11 of 17

minimal standard of living if forced to repay his student loans because his income is so close to the poverty level. ECMC appears to recognize this as it only challenges one of Debtor's monthly expenses as being unreasonable: Debtor's $775.00 per month rental expense. Specifically, ECMC argues that the $775.00 per month rental expense is unreasonable because Debtor could have moved into a public housing, income-contingent apartment in which the rent would only have been $485.00 per month. This court does not agree. Debtor testified to the following monthly expenses: $775.00 for rent, $160.00 for electricity, $51.00 for water, $108.00 for cable/internet/phone, $26.00 for medication, and $110.00 for Medicaid. Debtor further testified that his only real source of entertainment was fantasy football, which is free. Based upon these expenses and Debtor's testimony, this court finds that Debtor sacrificed his entertainment budget in order to live in a more expensive apartment that better suited his needs. This is a fair trade-off. See, e.g., McLaney, 375 B.R. at 674 (quoting In re Ivory, 269 B.R. 890, 899 (Bankr. N.D. Ala. 2001)) ("Even under the minimal standard of living test, '[p]eople must have the ability to pay for some small diversion or source of recreation, even if it is just watching television or keeping a pet.'").

    Debtor's overall budget is incredibly tight, as he has very little income coming into his household. This court will not substitute its judgment for the Debtor's as to what is an appropriate division of his limited resources. Debtor has proven that his income is slight and his expenses are reasonable. Despite this fact, Debtor is still unable to meet all of his monthly obligations without using the proceeds from the retroactive award given to him by the Social Security Administration: Debtor testified that he must use roughly $100.00 per month of these proceeds to make ends meet. Debtor has shown that he cannot maintain a minimal standard of living even if not forced to repay his student loan obligations. Therefore, Debtor has met his burden of proof as to the first prong of

12

the Brunner test.

The second prong of the Brunner test requires that Debtor prove "that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans." In re Mosley, 494 F. 3d at 1324-25. "These circumstances may include, but are not limited to, 'illness, disability, a lack of useable job skills, or the existence of a large number of dependents.'" Barrett v. Educ. Credit Mgmt. Corp. (In re Barrett), 487 F. 3d 353, 359 (6th Cir. 2007) (quoting Oyler v. Educ. Credit Mgmt. Corp., 397 F. 3d 382, 385 (6th Cir. 2005)) (citations omitted). The Social Security Administration found that Debtor has a "confirmed schizophrenic delusional, paranoid and psychotic disorder that has led to a depleted function despite psychotropics, and psychosocial support." (Plaintiff's Exhibit I). In short, Debtor suffers from a serious, ongoing, incurable mental illness which will likely continue to interfere with his ability to work. Debtor has met his burden of proof as to the second prong of the Brunner test. See, e.g., Id. (quoting Oyler v. Educ. Credit Mgmt. Corp., 397 F. 3d 382, 385 (6th Cir. 2005)) ("Ultimately, the most important factor in satisfying the second prong is that the 'additional circumstances' must be 'beyond the debtor's control, not borne of free choice.'"); King v. Vermont Student Assistance Corp. (In re King), 368 B.R. 358, 371 (Bankr. Vermont 2007) ("The most critical question when assessing a mental condition pursuant to the second Brunner prong is whether the debilitating condition is long-term, *i.e.*, expected to extend into the future such that employment is not a possibility and repayment is not an option.").

The third prong of the Brunner test requires "that the debtor has made good faith efforts to repay the loans." In re Mosley, 494 F. 3d at 1324-25. "Good faith is measured by the debtor's efforts to obtain employment, maximize income, and minimize expenses; his default should result,

13

not from his choices, but from factors beyond his reasonable control." Id. at 1327.

ECMC argues that Debtor has not made good faith efforts to repay the loans owed to it because Debtor has not maximized his income.[14] While Debtor is highly educated, he has been unable to obtain employment in fields where he has experience, most likely due to his illness. In addition, although Debtor graduated with a juris doctorate, he has been unable to pass the bar exam; therefore, he is not qualified to seek employment as a lawyer. In short, despite Debtor's education and experience, his paranoid schizophrenia makes him unable to perform under stress and also makes it very unlikely that he will ever obtain a position in which he is given responsibility, i.e., a position in which he is well-paid. Debtor recognizes his shortcomings and has mainly concentrated on finding a low-level retail or office position.[15] Debtor testified that he has been looking for work online but that he has been unable to find a position. Debtor further testified that he applied at various retail outlets, but was unsuccessful in getting an offer of employment. Debtor has been unable to find steady employment since he lost his job with Cushman & Wakefield in January 2008 and is unlikely to find steady employment in the future. Debtor has shown that he maximized his income to the best of his ability. See Educ. Credit Mgmt. Corp. v. Polleys, 356 F. 3d 1302, 1310 (10th Cir. 2004) (citations omitted) (stating "courts should base their estimation of a debtor's

---

[14]Specifically, ECMC questioned Debtor at trial about whether Debtor had consulted a vocational therapist. Debtor responded that he had not consulted a vocational therapist because he had no idea vocational therapists existed. This court does not agree and will not find that a debtor must seek out a vocational therapist in order to maximize income. A debtor should not be forced to expend extremely limited resources in order to prove good faith.

[15]Although he has concentrated mainly on low-level positions, he did apply for positions with 10 real-estate-related businesses in Tuscaloosa, Birmingham, and Montgomery, Alabama because he has experience in this field. Debtor did not receive any response from these companies.

14

prospects on specific articulable facts, not unfounded optimism").

ECMC argues that Debtor has not made good faith efforts to repay the loans owed to it because Debtor has not minimized his rental expense. As discussed above in the section dealing with the first prong of the Brunner test, Debtor's expense budget is reasonable. The only expense that might be high is the rental expense, but this court found above that Debtor sacrificed his entertainment budget in order to live in a more expensive apartment that better suited his needs, and that this is fair trade-off. Debtor has sufficiently minimized his expenses to prove good faith. In re McLaney, 375 B.R. at 677.

Finally, ECMC argues that Debtor has not made good faith efforts to repay the loans owed to it because Debtor has not attempted to negotiate a repayment plan under the Income Contingent Repayment Program.[16] The Income Contingent Repayment Program "adjusts the debtor's payment in response to hardship and extends the repayment period to as much as 25 years." In re Mosley, 494 F. 3d at 1327. Debtor's payment under the Income Contingent Repayment Program would be $0.00. "While a debtor's effort to negotiate a repayment plan certainly demonstrates good faith, courts have rejected a per se rule that a debtor cannot show good faith where he or she has not enrolled in the Income Contingent Repayment Program." In re Mosley, 494 F. 3d at 1327. ECMC argues that because Debtor's payment would be $0.00, Debtor must enroll in the program in order to prove good

---

[16]ECMC also argued at trial that Debtor did not make good faith efforts to repay the student loans owed to it because Debtor consolidated his student loans in 2004, after being diagnosed with schizophrenia. This court does not agree with the position taken by ECMC. People consolidate loans so that they will have one monthly payment, usually lower than the combined payments being made under individual loans, while also locking in a fixed interest rate. Because a consolidation loan does not result in the incurrence of new debt, this court finds that application for a consolidation loan is not an indication that a debtor is not making good faith efforts to repay student loan obligations.

15

faith because a $0.00 monthly payment cannot impose an undue hardship. This court does not agree. The monthly payment is not the only factor in determining whether a student loan debt imposes an undue hardship. As numerous courts have pointed out, the Income Contingent Repayment Program "is not always a viable option for debtors . . ., as it may require them effectively to 'trad[e] one nondischargeable debt for another' because any debt that is discharged under the program is treated as taxable income." In re Mosley, 494 F. 3d at 1327 (quoting Barrett v. Educ. Credit Mgmt. Corp. (In re Barrett), 487 F. 3d 353, 364 (6th Cir. 2007)). In addition, "[ECMC's] position would create a per se rule requiring enrollment in the [Income Contingent Repayment Program] to satisfy the third Brunner prong and thus would, in effect, eliminate the discharge of student loans for undue hardship from the Bankruptcy Code." In re Barrett, 487 F. 3d at 364. Because Debtor's situation is not expected to improve in the future, this court does not believe that Debtor would benefit from enrollment in the Income Contingent Repayment Program, as the most likely outcome is that Debtor would be unable to make payments during the 25 year repayment term, his debt will continue to grow as interest accrues and is added to the principal balance, and when he is discharged of the debt in 25 years he will have a large tax bill as a consequence. This would impose an undue hardship on Debtor. In re Bronsdon, 435 B.R. at 802 (stating that "the ICRP may be beneficial for a borrower whose inability to pay is temporary and whose financial situation is expected to improve significantly in the future." but that "[w]here no significant improvement is anticipated, however, such programs may be detrimental to the borrower's long-term financial health"). Therefore, lack of participation in the program does not indicate that Debtor is not making good faith efforts to repay his student loans. Debtor obtained forbearance/deferment agreements on the loans owed to ECMC until 2010, and that is the reason that he did not make any payments on such loans. Debtor has met his burden

16

of proof as to the third prong of the Brunner standard.

## CONCLUSION

Debtor proved by a preponderance of the evidence that: (1) he cannot maintain, based on current income and expenses, a minimal standard of living for himself if he is forced to repay the student loans owed to ECMC; (2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans owed to ECMC; and (3) that he has made good faith efforts to repay the loans owed to ECMC. Therefore, Debtor proved all the elements required for a finding of undue hardship under the Brunner standard adopted by the Eleventh Circuit Court of Appeals in Hemar Ins. Corp. of America v. Cox (In re Cox), 338 F. 3d 1238, 1240 (11th Cir. 2003). Therefore, Debtor proved that the repayment of the student loans owed to ECMC would impose an undue hardship on him. Therefore, pursuant to 11 U.S.C. § 523(a)(8), Debtor proved that he is entitled to a judgment finding that the student loan debt owed to ECMC is dischargeable.

**DONE and ORDERED** this March 23, 2012.

/s/ C. Michael Stilson
C. Michael Stilson
United States Bankruptcy Judge